**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, 59 Route 10, East Hanover, New Jersey 07936, *Plaintiff,* v. DIANA ESPINOSA, in her official capacity as ACTING ADMINISTRATOR, HEALTH RESOURCES AND SERVICES ADMINISTRATION, 5600 Fishers Lane, Rockville, Maryland 20852, and XAVIER BECERRA, in his official capacity as SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue, S.W., Washington, D.C. 20201, *Defendants.* | Civil Action No. _____ |

## VERIFIED COMPLAINT

Plaintiff Novartis Pharmaceuticals Corporation (Novartis) brings this Complaint against

Defendants Diana Espinosa, in her official capacity as Acting Administrator of the Health

Resources and Services Administration (HRSA), and Xavier Becerra, in his official capacity as

Secretary of the Department of Health and Human Services (HHS), and alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for preliminary and permanent injunctive relief to challenge a recent HRSA determination that Novartis's policy governing so-called "contract pharmacy" arrangements is not in compliance with the 340B statute, 42 U.S.C. § 256b, and an accompanying threat of enforcement action.

2.      Under the 340B Drug Pricing Program, drug manufacturers that wish to participate in certain Medicaid and Medicare programs must offer deep discounts to specified hospitals and clinics benefiting underserved patient populations.  To ensure that the discounts are appropriately targeted to the right recipients, the 340B statute carefully circumscribes the universe of hospitals and clinics that qualify as "covered entities" entitled to those steep discounts.

3.      In recent years, there has been an explosion of so-called "contract pharmacy" arrangements, in which covered entities enter into contractual arrangements with third-party pharmacies—often large, national, for-profit pharmacy chains.  Under a contract pharmacy arrangement, drugs are not shipped to the covered entity for dispensing at the covered entity. Instead they are shipped directly to the contract pharmacy—wherever in the country that pharmacy may be.

4.      Nothing in the statute contemplates—let alone requires—that manufacturers agree to ship drugs nominally purchased by covered entities directly to "contract pharmacies" for dispensing to both patients and non-patients of the covered entity alike.  And yet that is precisely what HRSA has purported to mandate here.

5.      Under the plain language of the 340B statute, Novartis is not required to recognize *any* contract pharmacy arrangements.  Nevertheless, in order to strike a reasonable

balance between redressing abuses of the 340B Program and serving the statute's goals, Novartis voluntarily recognizes [1] all contract pharmacies within a 40-mile radius of the covered entity, [2] all federal grantee covered entity contract pharmacy arrangements, regardless of location, and [3] an exemption to the 40-mile radius limitation when the facts and circumstances require.

6.     On May 17, 2021, HRSA notified Novartis that it has concluded Novartis's policy violates the 340B statute.  Exhibit 1 (the Decision Letter).  HRSA demanded a response by June 1, and threatened enforcement action if Novartis did not drop its contract pharmacy policy.

7.     HRSA's decision is unlawful under the Administrative Procedure Act (APA).  First, it conflicts with the plain language of the statute.  The 340B statute does not mandate—nor does it give the agency discretion to mandate—that manufacturers ship drugs to third-party pharmacies at the whim of covered entities.

8.     HRSA's decision also is arbitrary, capricious, and an abuse of discretion.  Under the agency's own guidance documents, contract pharmacy arrangements are eligible for 340B discounts only when specified requirements are met, including that the covered entity retains title to the drugs in question.  But the Decision Letter made no finding that any of the covered entities at issue actually retained title to the drugs at issue.  And due to limits on the ability of manufacturers to obtain even basic information about contract pharmacy arrangements, manufacturers have no way of knowing one way or the other.

9.     HRSA has failed to offer an adequate explanation for its evolving position on whether and in what circumstances contract pharmacy arrangements trigger the 340B discount.

10.    Absent prompt judicial relief, Novartis will suffer irreparable harm in the form of unlawful enforcement actions and significant reputational harm.  The government's public

3

assertion that Novartis is knowingly and intentionally violating its federal obligations plainly injures Novartis's reputation.

11.     For all of these reasons, HRSA's Decision Letter should be vacated and declared unlawful, and HHS should be enjoined from proceeding with its threatened actions.

## PARTIES

12.     Plaintiff Novartis Pharmaceuticals Corporation is a pharmaceutical company.  It brings innovative medicines to market in order to enhance health outcomes for patients. Novartis is incorporated in the State of Delaware and has its principal place of business at 59 Route 10, East Hanover, New Jersey 07936.

13.     Defendant Diana Espinosa is the Acting Administrator of the Health Resources and Services Administration, an operating component within HHS.  The Acting Administrator maintains an office at 5600 Fishers Lane, Rockville, Maryland 20852.  The Administrator is sued in her official capacity only.

14.     Defendant Xavier Becerra is the Secretary of HHS.  Defendant Becerra maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201, and is sued in his official capacity only.

## JURISDICTION AND VENUE

15.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 28 U.S.C. § 1361, in that this is an action to compel officers of the United States to perform their duty; and 28 U.S.C. §§ 2201–2202, in that there exists an actual justiciable controversy as to which Plaintiff requires a declaration of its

rights by this Court and injunctive relief to prohibit Defendants from violating laws and regulations.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because this is a civil action in which Defendants are officers of the United States acting in their official capacities and one of the Defendants maintains his office and conducts business in this judicial district.

## FACTUAL BACKGROUND

**The 340B Program**

17.     In 1992, Congress created the 340B Drug Pricing Program, which requires participating pharmaceutical manufacturers to provide deep discounts on their covered outpatient drugs to qualifying hospitals and clinics generally serving poor, uninsured, underinsured, or otherwise vulnerable patient groups.  42 U.S.C. § 256b(a).  The stated purpose of the program was to provide "protection from drug price increases to specified Federally-funded clinics and public hospitals that provide direct clinical care to large numbers of uninsured Americans."  H.R. Rep. No. 102-384 (II), at 12 (1992).  As a condition of federal payment being available under Medicaid and Medicare Part B for its covered outpatient drugs, a manufacturer must agree to participate in the 340B Program. 42 U.S.C. § 1396r-8(a)(1).

18.     At its core, the 340B Program requires a participating pharmaceutical manufacturer to charge a "covered entity" no more than the 340B ceiling price—a discounted price calculated under a prescribed statutory formula—for each unit of a covered outpatient drug. 42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1).  A participating manufacturer must "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  42 U.S.C. § 256b(a)(1).

19.     The statute defines the term "covered entity" narrowly, to ensure that the 340B program's steep discounts benefit only the qualified safety net providers and the neediest patient populations.  42 U.S.C. § 256b(a)(4).  To count as a "covered entity," a provider must be a specifically enumerated type of safety-net entity.  These include entities operating under a federal grant as well as particular types of hospitals, such as certain children's hospitals and freestanding cancer hospitals. *Id.*

20.     The 340B Pharmaceutical Pricing Agreement (PPA), which a manufacturer must execute to participate in the 340B Program, states that "covered entities" means "certain Public Health Service grantees, 'look-alike' Federal Qualified Health Centers, and disproportionate share hospitals."  PPA § 1(e).  The PPA also clarifies that, "in the case of a covered entity that is a distinct part of a hospital, the hospital itself shall *not* be considered a covered entity unless it meets the" statutory definition of "covered entity" as a qualified hospital.  *Id*. (emphasis added).

21.     The 340B statute contains two important limitations to protect against abuse by covered entities.  First, it prohibits "duplicate discounts"—a manufacturer cannot be required to both pay a Medicaid rebate *and* provide a 340B discount on the same unit of drug.  To accomplish this, a covered entity is prohibited from requesting payment under Medicaid for a unit of a covered outpatient drug purchased under the 340B Program.  42 U.S.C. § 256b(a)(5)(A)(i).

22.     Second, to prevent diversion, the statute prohibits a covered entity from reselling or otherwise transferring a 340B drug to "a person who is not a patient of the entity."  *Id.* § 256b(a)(5)(A).

**Contract Pharmacy Arrangements**

23.     At first, covered entities dispensed 340B-purchased drugs through their own in-house pharmacies.  But shortly after the 340B statute was enacted, some covered entities without an in-house pharmacy began lobbying HRSA for permission to enter into a contractual arrangement with a third-party pharmacy (a so-called "contract pharmacy") for purposes of dispensing 340B-purchased drugs.  Under these proposed arrangements, instead of drugs being shipped to the covered entity for dispensing by its in-house pharmacy, the drugs would be shipped to the contract pharmacy for dispensing to patients there.

24.     Contract pharmacy arrangements typically involve a "virtual inventory" or "replenishment" model—a scheme that facilitates 340B-discounted units to be dispensed to individuals who are not patients of the covered entity.  Under this model, the contract pharmacy maintains a single, common inventory—meaning it commingles units purchased at the commercial price with "replenishment" units purchased at the 340B price—and dispenses *all* units of the drug from this common inventory, regardless of whether the individual to whom a unit is dispensed is a patient of the covered entity.

25.     The contract pharmacy itself typically does not know at the time of dispensing whether an individual is a patient of the covered entity.  That determination is made afterwards. Where it is subsequently determined that the individual is a covered-entity patient, the covered entity purchases a "replenishment" unit at the 340B price and directs shipment to the contract pharmacy—which commingles the 340B-purchased unit with commercially purchased units in its common inventory.  The kicker:  the 340B replenishment unit is treated as it if had been purchased at the *commercial* price—and thus available for dispensing to a non-patient of the covered entity—even though it has in fact been purchased at the 340B price.  *See* OIG,

*Memorandum Report: Contract Pharmacy Arrangements in the 340B Program,* OEI-05-13-00431 at 5 (Feb. 4, 2014), available at https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

**HRSA's Evolving Guidance On Contract Pharmacies**

26.     In 1996, four years after the 340B Program came into being, HRSA issued non-binding guidance suggesting for the first time that a covered entity without an in-house pharmacy may contract with a single outside pharmacy site for the purpose of dispensing 340B-purchased drugs to the covered entity's patients.  *See* HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,549 (Aug. 23, 1996).

27.     HRSA stated that it was implementing the new contract pharmacy policy because it believed the goals of the 340B Program were better served if a covered entity without an in-house pharmacy could use an outside pharmacy to dispense 340B-purchased drugs to its patients on its behalf.  *Id.* at 43,550.  Accordingly, HRSA provided that a covered entity could use either an in-house pharmacy or, *if* the covered entity did not have an in-house pharmacy, it could contract with a *single* outside pharmacy site, to "facilitate program participation for those eligible covered entities that do not have access to appropriate 'in-house' pharmacy services."  *Id.* at 43,550, 43,555.

28.     In issuing the 1996 guidance, HRSA did not require manufacturers to honor contract pharmacy arrangements.  Nor did HRSA identify any statutory basis for its policy.  It stated only that "[t]he statute is silent as to permissible drug distribution systems.  There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself."  *Id.* at 43,549.  It then stated that the 340B statute does not preclude a "[covered] entity direct[ing] the drug shipment to its contract pharmacy."  *Id.* at 43,549–50.  HRSA also

stated that, "[a]s a matter of State law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients." *Id.* at 43,550.

29.      In 2007, HRSA summarized its 1996 guidance as follows: "[A] covered entity could contract with only one pharmacy to provide all pharmacy services for any particular site of the covered entity. Furthermore, if the contract pharmacy had multiple locations, the covered entity had to choose one, and only one, contract pharmacy location for provision of these services." HRSA, *Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services*, 72 Fed. Reg. 1540 (Jan. 12, 2007).

30.      Then things changed. In early 2010, HRSA issued another non-binding guidance that purported to greatly expand the agency's approach to contract pharmacies. HRSA, *Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services*, 75 Fed. Reg. 10,272 (Mar. 5, 2010). Under the 2010 guidance, covered entities are permitted to use contract pharmacies even if they have an in-house pharmacy. *Id.* at 10,275. Covered entities also are permitted to use an unlimited number of outside contract pharmacy sites, so long as there is a written contract between the covered entity and the pharmacy, and the contract pharmacy meets certain compliance and certification requirements. *Id.* at 10,277–278. One of those requirements is that "[t]he covered entity will purchase the drug, *maintain title to the drug* and assume responsibility for establishing its price, pursuant to the terms of an HHS grant (if applicable) and any applicable Federal, State, and local laws." *Id.* at 10,277 (emphasis added). *See also* HRSA, *Contract Pharmacy: Important Tips*, *available at* https://www.hrsa.gov/opa/updates/2016/august.html (Aug. 2016).

31.      The 2010 guidance, like its 1996 predecessor, does not state that manufacturers must honor contract pharmacy arrangements, nor (also like its predecessor) does it identify any

statutory basis for the contract pharmacy policy. In responding to a commenter suggesting that notice-and-comment rulemaking was required to adopt the policy, HRSA explained that it was not required to proceed via such rulemaking because its contract pharmacy policy does not "impose additional burdens upon manufacturers []or create[] any new rights for covered entities under the law." *Id.* at 10,273.

**Contract Pharmacy Arrangements Explode In Popularity**

32.      Following HRSA's 2010 guidance, the number of contract pharmacy arrangements entered into by hospitals grew exponentially—with little evidence that patients were benefiting as a result.

33.      Covered entities have an incentive to maximize 340B utilization because they profit off the "340B spread." Covered entities purchase the unit of the drug at the deeply discounted 340B price, then seek reimbursement from the patient's payer when the patient is insured. The covered entity captures the resulting "spread" between the (lower) 340B price and the inevitably higher reimbursement rate. The more contract pharmacies, the more opportunities to capture the spread, because more prescriptions can be filled through such arrangements. And there is no statutory obligation to share any of that revenue with those needy patients the 340B Program is intended to serve, through reduced prescription costs, for example.

34.      The contract pharmacies with which covered entities began to contract, starting in 2010, are often national chain sites located hundreds or even thousands of miles from the covered entity and the community that it serves. Indeed, "contract pharmacy participation grew 4,228 percent between April 2010 and April 2020," with "more than 27,000 individual pharmacies (almost one out of every three pharmacies)" now participating, and the number of contract pharmacy arrangements by hospitals increasing from 193 to more than 43,000 during

this period.  BRG, *For-Profit Pharmacy Participation in the 340B Program*, at 4 (Oct. 2020), available at https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf.

35.     In a subversion of statutory intent, the savings from the 340B Program—designed to benefit carefully selected beneficiaries—"are now distributed across a vertically integrated supply chain that includes not just the covered entities but also pharmacies, contract pharmacy administrators, [pharmacy benefit managers], health plans, and employer groups." *Id*. at 7.  And, as a result of the complete absence of transparency within such arrangements, it is unclear how much of the 340B Program savings actually inures to the benefit of these commercial interlopers. In this way, a statutory regime intended to benefit underserved populations is now being used to advantage large commercial profit-maximizing pharmacy chains and other commercial middlemen.

36.     In the years following 2010, there has been an exponential increase in the number of contract pharmacies, a corresponding increase in the amount of drug products subject to the 340B discount, and a similar upsurge in the potential for abuse of the 340B Program.  *See* Aaron Vandervelde and Eleanor Blalock, *Measuring the Relative Size of the 340B Program: 2012-2017*, Berkeley Research Group (Jul. 13, 2017), *available at* https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2012-2017/;  Adam Fein, *New HRSA Data: 340B Program Reached $29.9 Billion in 2019; Now Over 8% of Drug Sales*, Drug Channels (Jun. 9, 2020), *available at* https://www.drugchannels.net/2020/06/new-hrsa-data-340b-program-reached-299.html;

37.     This explosive growth of contract pharmacy arrangements has greatly exacerbated longstanding systemic 340B program integrity concerns.  Remember that, under the "virtual

inventory" ("replenishment") model, it is unknown at the time of dispensing whether an individual is a patient of the covered entity.  This necessitates a retrospective determination (typically performed by third parties) of which units were dispensed to a covered-entity patient and thus would have been eligible for 340B pricing.  There is no transparency into whether or how this determination is made.

38.    There is, however, confirmation that the system is being abused.  HRSA has identified hundreds of instances of diversion at contract pharmacies through its audit efforts, and many instances of the potential for duplicate discounts.  GAO, *Drug Discount Program, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement,* at 37 (June 2018), available at https://www.gao.gov/assets/gao-18-480.pdf.  In 2015, the HHS Office of Inspector General (OIG) concluded, in a triumph of understatement, that "[c]ontract pharmacy arrangements . . . create complications in preventing diversion . . . [and] duplicate discounts." OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, No. OEI-05-13-00431 at 1, 2 (Feb. 2014) (available at https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf).

39.    Where a covered entity makes arrangements with pharmacies far outside its community, this risk of diversion is amplified by orders of magnitude.  Because there is no reasonable proximity between such pharmacies and the local community of the covered entity (i.e., where patients of the covered entity obtain services), such pharmacies are highly unlikely to dispense drugs to patients *of the covered entity*.  Thus, in the absence of meaningful oversight of covered entities, such arrangements cannot be squared with the statutory prohibition on diversion—one of the Congressionally established cornerstones of the 340B Program that mark its outer boundary.

**Novartis's Contract Pharmacy Policy**

40.     Based on the plain language of the statute, Novartis is not legally bound to honor *any* contract pharmacy arrangement.  The statute requires only that Novartis offer the 340B discount on sales to covered entities, which it does.  42 U.S.C. § 256b(a)(1).  The statute does not require manufacturers to agree to ship the drugs to a third-party pharmacy for dispensing to patients (and non-patients) there.

41.     Given the runaway proliferation of contract pharmacy arrangements and its attendant programmatic abuses, Novartis revised its contract pharmacy policy in order to appropriately align it with the 340B statute's purpose and requirements, while guarding against needless abuse.

42.     Under its policy, Novartis honors all hospital covered entity contract pharmacy arrangements when the contract pharmacy is located within a 40-mile radius of the covered entity—which is to say, any contract pharmacy within an area that ranges about 5,000 square miles.  *Id.*  There is no limit on the number of contract pharmacies within that 40-mile radius with which the covered entity may have an arrangement.  *Id.*

43.     Federal grantee covered entities are exempted from the 40-mile radius policy. These entities are subject to independent requirements that encourage them to share the benefits of the 340B Program with their patients.

44.     Finally, if a hospital covered entity brings a special circumstance to Novartis's attention (for example, if it has no in-house pharmacy and no contract pharmacy within 40 miles), Novartis works in good faith with the hospital to ensure appropriate access to a contract pharmacy through an exemption process.  *Id.*

45.     In adopting the 40-mile radius as a proxy for the patient community, Novartis drew on the federal Medicare provider-based policy governing hospitals and affiliated facilities, which generally utilizes a 35-mile radius.  *See* 42 C.F.R. § 413.65(e)(3)(i).

46.     The 40-mile radius limitation is also consistent with HRSA's statements that its contract pharmacy policy is designed to allow covered entities to enter into "arrangements in their communities" to dispense needed drugs to their patients.   *See* 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).  And the 40-mile radius is a generous policy:  The vast majority of contract pharmacy hospitals are located within 40 miles of the covered entity.  GAO, *Drug Discount Program, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, at 23 (June 2018), available at https://www.gao.gov/assets/gao-18-480.pdf.

47.     The Novartis policy does not prohibit any covered entity from purchasing Novartis medicines at 340B prices.  Hospital covered entities are merely offered a choice of having the drug shipped to their own in-house pharmacy, or to an unlimited number of contract pharmacies located within a 40-mile radius of the hospital.  And if there are no contract pharmacies within that 40-mile radius (a rare occurrence, according to GAO data), covered entities are encouraged to apply for an exemption.

48.     Nor does Novartis's policy result in any overcharge to a covered entity.  When Novartis does not recognize a contract pharmacy under its policy, it does not convert a 340B order to a commercial order.  It simply declines to fill the 340B order, and the hospital is not charged.

49.     On October 30, 2020—and again on November 13, 2020—Novartis notified HRSA that it would be implementing this approach to contract pharmacy arrangements.  Exhibit 2.

**The Advisory Opinion**

50.     On December 30, 2020, the HHS Office of the General Counsel (OGC) issued a non-binding Advisory Opinion on contract pharmacy arrangements under the 340B statute.  *See* OGC, Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/340B-AO-FINAL-12-30-2020_0.pdf.

51.     In the Advisory Opinion, OGC opined that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." *Id*. at 1.  To reach that conclusion, the Advisory Opinion argued that the "core requirement of the 340B statute" is that "manufacturers must 'offer' covered outpatient drugs at or below the ceiling price for 'purchase by' covered entities." *Id.*  In an odd flight of rhetoric, the Advisory Opinion asserted that the "situs of delivery, be it the lunar surface, low-earth orbit, or a neighborhood pharmacy, is irrelevant." *Id.*

52.     The agency based its position on its view that the statute is *unambiguous*:  "It is difficult to envision a less ambiguous phrase and no amount of linguistic gymnastics can ordain otherwise." *Id.* (*citing Kisor v. Wilke*, 139 S. Ct. 2400, 2415 (2019)).  In light of what the agency described as "the lack of ambiguity in the plain text of the statute," OGC concluded that "the above analysis is dispositive." *Id.* at 3.

53.     In response to the Advisory Opinion, a number of manufacturers filed lawsuits against HRSA challenging its contract pharmacy policies.  *See, e.g., AstraZeneca Pharmaceuticals LP v. Azar*, Case No. 1:21-cv-0027 (D. Del.); *Novo Nordisk Inc. v. HHS*, Case

No. 3:21-cv-00806 (D.N.J.); *Eli Lilly & Co. v. Cochran,* Case No. 1:21-cv-00081 (S.D. Ind.); *Sanofi-Aventis US, LLC v. HHS*, Case No. 3:21-cv-00634 (D.N.J.).  Those cases remain pending.

**HRSA's May 17, 2021 Decision Letter and Novartis's Response**

54.     On May 17, HRSA wrote to Novartis, asserting that the agency had "completed its review" of Novartis's contract pharmacy policy.  Exhibit 1.  HRSA appeared to have reviewed the wrong policy, however; in its Decision Letter, the agency asserted that Novartis's policy "places restrictions on 340B pricing to covered entities that dispense medication through pharmacies, unless the covered entities provide claims data to a third-party platform." *Id.*  It does no such thing. [1]

55.     The agency went on to assert that, after reviewing Novartis's (prior, inapplicable) policy, it had "determined that Novartis's actions have resulted in overcharges and are in direct violation of the 340B statute." *Id.*  The Decision Letter argued that "HRSA has made plain, consistently since the issuance of its 1996 contract pharmacy guidance, that the 340B statute requires manufacturers to honor such purchases regardless of the dispensing mechanism." *Id.*

56.     The Decision Letter demanded that Novartis

immediately begin offering its covered patient drugs at the 340B ceiling price to covered entities through their contract pharmacy arrangements, regardless of whether they purchase through an in-house pharmacy.  Novartis must comply with its 340B statutory obligations and the [final rule governing civil monetary penalties (CMPs)] and credit or refund all covered entities for overcharges that have resulted from Novartis's policy.  Novartis must work with all of its distribution/wholesale partners to ensure all impacted covered entities are contacted and efforts are made to pursue mutually agreed upon refund arrangements.  [*Id.*]

---

[1]  In August 2020, Novartis had considered requiring covered entities to submit claims data so that eligibility for the 340B discount could be verified; it ultimately decided not to implement that policy.

57.     The Decision Letter requested a response by June 1, and ended with a threat: "Continued failure to provide the 340B price to covered entities utilizing contract pharmacies, and the resultant charges to covered entities of more than the 340B ceiling price, may result in CMPs as described in the CMPS final rule."  *Id.*

58.     Novartis responded on May 27, noting that HRSA's letter had mischaracterized the Novartis policy.  Exhibit 3.  Novartis also explained why its policy is consistent with the 340B statute:  The statute requires that manufacturers offer the 340B discount on sales to covered entities.  42 U.S.C. § 256b(a)(1).  Novartis does so.  The statute does not require manufacturers to agree to ship the drugs to some remote pharmacy for dispensing to patients (and non-patients) there.  Nor does the statute grant HRSA discretion to require manufacturers to ship drugs to a location potentially many miles away from the covered entity as it suggests in the Advisory Opinion, "be it the lunar surface, low-earth orbit, or a neighborhood pharmacy."

59.     In its response, Novartis requested that HRSA withdraw its Decision Letter and threat of enforcement by May 31, in advance of the June 1 deadline set by the agency in the Decision Letter.  Exhibit 3.

60.     As of the filing of this Complaint, HRSA has failed to withdraw the Decision Letter.

**HRSA's Decision Letter Is Unlawful**

61.     HRSA's Decision Letter is unlawful, for multiple reasons.

62.     First and foremost, the Decision Letter violates the plain language of the 340B statute.  The statute only requires a participating manufacturer to "offer each *covered entity* covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  42 U.S.C. § 256b(a)(1) (emphasis added).

63.     The statute provides no basis on which a covered entity may force a manufacturer to ship a unit purchased at the 340B price to a *contract pharmacy*.

64.     HRSA argues that the statute is silent "on how the *covered entity* chooses to distribute the covered outpatient drugs." Exhibit 1 (emphasis added).   First of all, that is not true.  The 340B statute specifically states that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity." 42 U.S.C. §256b(5)(B).

65.     But in any event, the agency is wrong to equate the latitude that may or may not be given covered entities *after* their exercise of their limited statutory right to purchase the drug *at the statutorily specified price* with the right to require manufacturers to ship the purchased drug directly to contract pharmacies.  So long as the manufacturer is willing to ship the unit to the covered entity, the manufacturer operates in compliance with the plain language of the statute.  And here, Novartis has expressed a willingness to ship not just to covered entities, but to [1] *any* contract pharmacy within 40 miles of a hospital covered entity (an area that covers roughly 5,000 square miles); [2] *any* contract pharmacy, anywhere, affiliated with a federal grantee; and [3] *any other* contract pharmacy, when circumstances warrant making an exception to the general policy.

66.     Moreover, the agency has boxed itself into a *Chevron* corner.  By taking the position in the Advisory Opinion that the language of the statute is "unambiguous,"[2] and asserting in its Decision Letter that "the 340B statute *requires* manufacturers to honor such purchases regardless of the dispensing mechanism," Exhibit 1 (emphasis added), the agency has disavowed any argument that the statute is ambiguous and thus that any interpretation of the

---

[2]  OGC, Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020), available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/340B-AO-FINAL-12-30-2020_0.pdf.

statute it may offer is entitled to deference.  The agency's position therefore must rise and fall on its ability to demonstrate that the statute unambiguously requires manufacturers to honor all contract pharmacy arrangements, of whatever ilk.  *See, e.g., Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (explaining that "*Chevron* step 2 deference" is reserved only "for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face").

67.     The agency's own previous guidance documents undermine any suggestion that the 340B statute *requires* manufacturers to recognize all contract pharmacy arrangements. HRSA's 1996 non-binding guidance permitted *only* covered entities lacking an in-house pharmacy to contract with a *single* contract pharmacy site, in an effort to "facilitate program participation for those eligible covered entities that do not have access to appropriate 'in house' pharmacy services."  61 Fed. Reg. at 43,550, 43,555.  HRSA reiterated that position in 2007.  72 Fed. Reg. 1540.  The 1996 guidance would make no sense if the statute already mandated that *all* contract pharmacy arrangements be recognized, regardless of number and regardless of whether the covered entity had an in-house pharmacy.  And even with respect to this limited universe of contract pharmacy arrangements, the guidance did not purport to require manufacturers to recognize any contract arrangement entered into by a covered entity under its terms.  Indeed, the guidance expressly disclaimed that it was creating any rights or imposing any obligations at all. 61 Fed. Reg. at 43,550 ("We believe that these guidelines create no new law and create no new rights or duties.").

68.     In its Decision Letter, HRSA also argues "manufacturers are expected to provide the same opportunity for 340B covered entities and non-340B purchasers to purchase covered outpatient drugs."  But the agency identified no basis for asserting that Novartis has treated

covered entities differently than other purchasers.  Nor could it.  Novartis offers the same

opportunity for 340B covered entities to *purchase* covered outpatient drugs as it does to any

other purchaser.  And it does not recognize any commercial arrangements equivalent to 340B

contract pharmacy arrangements, where the purchaser is empowered to unilaterally direct

shipment to some other distant third-party location.  That simply does not happen outside of the

world of contract pharmacies.  The agency's statutory arguments therefore are unavailing.

69.     The agency's position as reflected in the Decision Letter is also arbitrary and

capricious, for a number of reasons.  First, HRSA's *any contract pharmacy anywhere, including*

*on the moon* position is illogical to the point of being arbitrary and capricious.

70.     Second, HRSA has failed to offer an adequate explanation for its change in

position between the 1996 guidance (only covered entities lacking an in-house pharmacy may

contract with a single outside contract pharmacy site) and its later inconsistent positions in the

2010 guidance (covered entities may contract with an unlimited number of contract pharmacies,

regardless of whether they also maintain an in-house pharmacy) and 2020 Advisory Opinion

(same, and manufacturers must recognize such arrangements).  In fact, HRSA has failed even to

acknowledge its changes in position, repeatedly asserting that its policy has remained consistent

all along.  *See, e.g.*, Exhibit 1 at 1 ("HRSA has made plain, consistently since the issuance of its

1996 contract pharmacy guidance, that the 340B statute requires manufacturers to honor such

purchases regardless of the dispensing mechanism").   That is the dictionary definition of

arbitrary and capricious.

71.     Finally, the agency's decision is based on a faulty record.  HRSA's own guidance

documents make clear that the 340B discount is available only where specified conditions are

met, including that the covered entity retains title to the drugs in question and the contract

pharmacy agreement contains specified terms relating to contract pharmacy services. 75 Fed. Reg. at 10,277. But the Decision Letter made no finding that—nor did it even address whether—any of the covered entities at issue actually retained title to the drugs at issue or otherwise comply with the enumerated conditions. Nor could it as any practical matter, given that the terms of these arrangements are not disclosed to HRSA or manufacturers and that contract pharmacies commingle 340B-purchased units with the rest of their stock for dispensing to both patients and non-patients of the covered entity alike.

72.     This is not just a hypothetical problem. OIG's own analysis shows that covered entities use a variety of different contract pharmacy arrangements, and that "[t]he variety of data types and comparison methods used to identify 340B-eligible prescriptions can result in differing determinations of 340B eligibility across covered entities." OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program,* OEI-05-13-00431 at 9–10 (Feb. 4, 2014), available at https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf. And yet neither HRSA nor any manufacturer has sufficient information to identify qualifying transactions. As GAO has noted, "HRSA does not have complete data on all contract pharmacy arrangements in the 340B program to inform its oversight efforts." *See* GAO, *Drug Discount Program, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, at 36 (June 2018), available at https://www.gao.gov/assets/gao-18-480.pdf.

**HRSA's Actions Will Cause Immediate and Irreparable Harm**

73.     The Decision Letter ends with a threat: HRSA will move to impose CMPs absent compliance by Novartis. That threat is unwarranted: CMPs are permissible only in the event of a knowing and intentional overcharge for a drug purchased by a covered entity. 42 U.S.C.

§ 256b(d)(1)(B)(vi); 42 C.F.R. § 10.11(a).   But it is a threat nevertheless, and one with immediate real-world consequences for Novartis.

74.   Novartis has not "overcharged" any covered entities, let alone done so knowingly and intentionally.  Under Novartis's policy, when an order is made through a non-qualifying contract pharmacy arrangement, the order is *declined*.  A covered entity is not charged any price, let alone overcharged, and Novartis at all times continues to offer the covered outpatient drug to the covered entity at the 340B price, including through qualifying contract pharmacy arrangements.

75.   Novartis also has acted at all times in good faith, based on a reasonable, legally defensible understanding of the plain language of the 340B statute.  Novartis provided HRSA with advance notice of its policy in November 2020, before implementation, and explained its legal justification for the policy in that notice.  Novartis similarly gave covered entities advance notice of its intended course of action.  The Decision Letter—with the threat—was the first time the agency provided a response addressing the Novartis policy.

76.   CMPs are a harsh sanction, and the process for imposing them is a public one.  In the Decision Letter, HRSA threatens to seek penalties up to nearly $6,000 for each instance in which the government believes Novartis sold a product to a covered entity at an incorrect price.  That is a financial loss, but it is one that is irreparable because it threatens Novartis's ability to invest in pipeline products, talent, and research and development.

77.   Despite the fact that HRSA's threat lacks merit, Novartis now faces a Hobson's choice:  submit to the agency's demand that it continue to provide steep, unwarranted discounts that benefit large pharmacy chains, or face stiff penalties and a host of reputational harms from an unwarranted and unlawful enforcement proceeding.

78.     Absent prompt judicial relief, Novartis will suffer irreparable harm.  The government's public assertion that Novartis has knowingly and willfully violated its 340B obligations plainly injures Novartis reputation.  Even the Decision Letter *threatening* enforcement action garnered immediate media attention highlighting the allegation that Novartis is out of compliance with the 340B program.  *See, e.g.,* Jeff Legasse, *Six Drugmakers Are In Violation Of 340B Statute, Says HRSA,* Healthcare Finance (May 18, 2021), https://bit.ly/3u7qilU; Kathy Kelly, *340B Fight Escalates As Biden Administration Seeks Refunds From Manufacturers, Threatens Them With Fines,* Pink Sheet Daily (May 20, 2021), https://bit.ly/33XE9Rn.

## COUNT I
### (Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)

79.     Novartis re-alleges and incorporates by reference the allegations in the foregoing numbered paragraphs.

80.     The APA prohibits HRSA from carrying out the agency's statutory and regulatory duties in a manner that is unlawful, arbitrary, capricious, an abuse of discretion, or contrary to a constitutional right.  *See* 5 U.S.C. § 706(2).

81.     HRSA's contract pharmacy policy violates the plain language of the 340B statute and is otherwise unlawful and in excess of the agency's statutory powers.  The statute provides no basis on which a covered entity may force a manufacturer to ship a unit purchased at the 340B price to a contract pharmacy.  The statute entitles a covered entity only to "purchase" a covered outpatient drug at the 340B price.  42 U.S.C. § 256b(a)(1).

82.     HRSA's contract pharmacy policy also is arbitrary and capricious, lacks a logical basis, and constitutes an abuse of discretion.  First, HRSA's *any contract pharmacy, anywhere, including on the moon* position is illogical to the point of being arbitrary and capricious.

23

83.     HRSA also has acted arbitrarily and capriciously because the agency has failed to offer an adequate explanation for its change in position between the 1996 guidance and its later inconsistent positions in the 2010 guidance and 2020 Advisory Opinion.  In fact, HRSA has failed even to acknowledge that change in position, repeatedly asserting that its policy has remained consistent all along.  The agency's failure to reconcile its change in position is arbitrary and capricious.

84.     Finally, the HRSA decision is arbitrary because it was based on a faulty record. The agency's own guidance documents make clear that the 340B discount is available only where the contract pharmacy arrangement meets various specified criterion, including that the covered entity retains title to the drugs in question.  But the Decision Letter made no finding that—nor did it even purport to address whether—any of the covered entities at issue actually retained title to the drugs at issue or satisfied any of the other conditions spelled out in agency guidance.  And due to the lack of transparency into contract pharmacy arrangements, manufacturers have no way of knowing if the title for any given drug purchased at the 340B discount remains with the covered entity—particularly in light of the replenishment model, under which 340B-purchased drugs are commingled into the general stock of the pharmacy for dispensing to both patients and non-patients of the covered entity alike.

85.     The Decision Letter constitutes final agency action for which Novartis has no other adequate remedy at law.  It would be futile for Novartis to avail itself of any remaining administrative review.

86.     Both Novartis and the public would be irreparably harmed if the Decision Letter (and the agency's reasoning as explained therein) were allowed to stand.

87.     The intent of Congress and the public interest will be served by an Order vacating the Decision Letter and HRSA's contract pharmacy policy as explained therein.

**PRAYER FOR RELIEF**

For the foregoing reasons, Novartis prays for the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that the agency's position regarding contract pharmacies is unlawful.

B.  An order vacating and setting aside the Decision Letter on the grounds that it is unlawful, arbitrary, and capricious.

C.  Temporary, preliminary, and permanent injunctive relief barring Defendants and any entities acting in concert with them from initiating and/or pursuing any enforcement actions against Novartis in connection with its 340B contract pharmacy policy.

D.  An order awarding Novartis its costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

E.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

   /s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
Harrison Gray Kilgore (D.C. Bar No. 1630371)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202)637-5910
cate.stetson@hoganlovells.com

*Attorneys for Plaintiff Novartis Pharmaceuticals Corporation*

Dated:  May 31, 2021

## **VERIFICATION**

I, the undersigned, having read the allegations of the foregoing Verified Complaint,

hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual

allegations asserted in the Verified Complaint are true and correct.

Executed this 31st day of May, 2021.

Daniel Lopuch